**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**STEPHANIE WELLS COTTON,** *et al.*                                      **PLAINTIFFS**

**v.**                    **NO. 4-02-CV-00604 GTE**
                              **Consolidated with:**
                              **No. 4:02-CV-00731 GTE**
                              **No. 4:03-CV-00003 GTE**

**COMMODORE EXPRESS, INC.,** *et al.*                                      **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

Before the Court is a Motion for Summary Judgment filed by Ryder Truck Rental, Inc., d/b/a Ryder Transportation Services ("Ryder"). Therein, Ryder requests a legal ruling that it is not liable for the negligent acts of Defendant Commodore Express, Inc. ("Commodore"). For the reasons stated herein, the Court concludes that Ryder is entitled to judgment as a matter of law.

**I.     The Accident Giving Rise to the Lawsuit**

On July 25, 2002, a traffic accident on Interstate 40 in Faulkner County, Arkansas, claimed the lives of three individuals riding together in one vehicle: (1) Edna Giles-Vaughn; (2) Versie Mae Buchanan; and (3) Robert Vaughn. The estates of all three decedents filed separate lawsuits against Commodore Express. This Court consolidated all three actions. Intervenor Plaintiff Ronald Valentine was injured in the accident and is also pursuing a claim against Commodore.

Plaintiffs contend that a 2003 Freightliner driven by Jesus Carrilo and traveling eastbound crossed the median into the westbound lane, colliding with a tractor trailer driven by Ronald Valentine. On impact, the Carillo vehicle traveled over the top of the Valentine vehicle and

came to rest in the median. The refrigerator unit of the Carillo unit became airborne and struck the front of the Vaughn vehicle, a van. On impact, the vehicle caught fire. All three passengers in the van were killed. Mr. Carillo and his wife, who was riding with him, also lost their lives in the accident.

## II.     Issue on Summary Judgment

Commodore is a common carrier in the business of hauling general commodities and produce nation-wide. Commodore leased from Ryder the tractors (but not the trailers) used to operate its business. Ryder is named as a Defendant in this lawsuit because it leased the tractor Mr. Carillo was driving to Commodore.

It is undisputed that Commodore Express, as Mr. Carillo's employer, will be liable for Mr. Carillo's negligence. The question before the Court is whether Ryder may also be liable for Mr. Carillo's negligence. Ryder has moved for summary judgment on the issue. Plaintiffs seek to hold Ryder liable under theories of respondeat superior and principal-agent liability.

## III.    Summary Judgment Standard

Summary judgment should be entered if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). A genuine issue of material fact exists only if there is sufficient evidence from which a jury can return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

The determination of whether Ryder was an employer or principal of Commodore or Mr. Castillo is a legal conclusion, requiring both a determination of facts and application of law. In opposing summary judgment, Plaintiffs focus on the fact-intensive nature of the inquiry,

suggesting that the issue should be resolved by a jury. However, where the material undisputed facts permit only one reasonable legal conclusion, summary judgment is appropriate. *See Howard v. Dallas Morning News, Inc.*, 324 Ark. 91, 918 S.W.2d 178, 185 (Ark. 1996)("where the facts are undisputed, and only one inference can reasonably drawn from them, [the question of agency] becomes a question of law.").

**IV.     Facts without Material Controversy**

Ryder has no ownership interest in Commodore. Ryder and Commodore entered into a written lease, entitled Truck Lease and Service Agreement ("the Lease").[1] The Lease sets forth the terms and conditions under which Ryder agreed to lease tractors to Commodore and also to provide maintenance for such leased vehicles.

Although Ryder leased tractors to Commodore, it did not provide Commodore with drivers, trailers, or cargo. There is no evidence that Ryder exercised any control or authority over where Commodore operated the leased tractors. Ryder billed Commodore weekly for services provided. The charges included fixed charges for the lease of each tractor; five cents for each mile driven by the leased tractors, charges for liability insurance, and a prorated charge for the federal highway use tax. Commodore purchased its own fuel. Ryder paid Commodore's fuel taxes, but billed Commodore for reimbursement on a monthly basis.

The Carillos were employed by and paid directly by Commodore. All Commodore drivers are Commodore employees. Ryder did not provide benefits or health insurance to Commodore or its drivers.

The Lease required Commodore to furnish and to maintain primary liability insurance on

---

[1]     (Exh. A to Ryder's motion for summary judgment, docket # 130, hereinafter "Ryder's motion").

all leased tractors at its own cost. The Lease offered Commodore the option of purchasing the required insurance through Ryder or from any insurer of Commodore's choosing. Commodore elected to purchase coverage from Old Republic through Ryder, with policy limits of one million dollars.[2] That amount is an industry standard. Commodore purchased insurance for its trailers and cargos, and workers' compensation insurance, through another company.

Under the Lease, Ryder was obliged to perform all maintenance and repairs to the leased tractors. Commodore agreed to return each vehicle to Ryder's Maintenance Facility for at least eight (8) hours per month for preventative maintenance. Additionally, Commodore's drivers prepared Driver Vehicle Condition Reports to indicate specific items the drivers wanted Ryder's maintenance department to address. Drivers were to complete such reports after every "tour of duty."

The tractor driven by Carillos was painted with Commodore's logo. Ryder placed a unit number and location number on each tractor for its internal use. The numbers were placed on the tractor hood or near where the hood closes. Some of Ryder's tractors had a small, four-inch "Ryder" identification above the tractor unit number. The Court will assume for purposes of this motion that the tractor driven by Carillos also had the small, four-inch "Ryder" identification on the hood.

The Interstate Commerce Commission ("ICC") authorization and the ICC motor carrier identification number for the tractor involved in this accident were in Commodore's name. The United States Department of Transportation ("USDOT") number on the tractor belonged to

---

[2] Earlier in this case, the Court ruled as a matter of law that a policy of excess insurance provided by Old Republic Insurance Company to Ryder provided no coverage to Commodore. (See Court's Order of March 28, 2004, Docket No. 110). This ruling was affirmed by the Eighth Circuit Court of Appeals. (*See* Eighth Circuit Opinion filed September 18, 2006, attached to Mandate, Docket No. 124).

Commodore. Ryder had no control or supervision over Commodore's compliance with USDOT regulations.

## V. Analysis

### A. Choice of Law

All parties appear to agree that there is no conflict between the laws of the three states whose law might be applied – Arkansas, Florida or Tennessee – on the issues presently before the Court. All three jurisdictions apply the law of agency relied upon by the parties, as stated in the Restatement (Second) of Agency. The Court agrees that there appears to be no conflict of law necessitating a choice of law analysis.

### B. Ryder is not Commodore's Employer

Plaintiff Dunn contends that "the relationship between Ryder and Commodore constitutes a common law master/servant relationship," and thus, Ryder has respondeat superior liability for this accident. Plaintiff Dunn relies upon the Restatement's definition of servant, *to-wit*:

> (1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
> (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
> > (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> > (b) whether or not the one employed is engaged in a distinct occupation or business;
> > (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> > (d) the skill required in the particular occupation;
> > (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> > (f) the length of time for which the person is employed;
> > (g) the method of payment, whether by the time or by the job;
> > (h) whether or not the work is a part of the regular business of the

     employer;
     (i) whether or not the parties believe they are creating the relation
     of master and servant; and
     (j) whether the principal is or is not in business.

Rest.2nd Agency, § 220.

  The arguments put forth by Plaintiff Dunn ignore the reality of the contractual business arrangement between Ryder and Commodore as set forth in the Leases. The relationship on paper is clearly a lessor-lessee relationship, not an employer-employee relationship. Additionally, the undisputed facts show that the Lease agreement accurately reflects the relationship between the parties. In other words, this is not a case where the contractual agreement bears little resemblance to the actual practice of the parties.

  Ryder did not solicit Commodore to perform a task for Ryder. Ryder retained no authority to tell Commodore whose cargo to haul, where and when to haul it, or what to charge for its services. Ryder has no ownership interest in Commodore's business. Nor is Ryder's profit under the Lease dependent on the profit Commodore makes in operating its business. The Lease agreement is set up to guarantee to Ryder a specific return based upon its investment in capital. The Lease provides that Commodore will pay Ryder $2,542.00 per month per tractor plus five cents per mile for each mile driven. Ryder is obligated to provide maintenance on the tractors. The fact that Ryder elected to require and Commodore agreed to pay an additional charge per mile reflects the reality that Ryder's expense to maintain, repair and provide substitute vehicles for tractors leased to Commodore is likely to increase the more the tractors are driven.

  Nor does the fact that Ryder provided safety training to Commodore or its drivers convert Ryder to an employer. Nor does the fact the Ryder retained what likely operated in effect as a veto power over Commodore's selection of drivers based on their driving record alter the Court's conclusion in anyway. Both of these issues are discussed in greater detail below in connection

with the dual agency argument. The discussion below applies equally to the respondeat superior argument and provides additional support for the Court's conclusion.[3]

Plaintiff Dunn points out that Commodore received considerable financial support from Ryder under the agreed upon arrangement, pointing out that the Lease is "fully financed." That the Lease terms may have been constructed to provide Commodore, a relatively young corporation, with access to the tractors necessary to perform its hauling services without a significant outlay of cash does not make Commodore or Mr. Castillo Ryder's employee (or agent). The fact that Ryder had a significant financial investment in the tractors it leased to Commodore provides good reason for the Lease terms which Plaintiffs point to as evidence of an employer-employee or principal-agent relationship. Such terms are justified by the economic realities of the relationship and do not in and of themselves support the conclusions urged by Plaintiffs.

The Court recognizes that the "relationship of master and servant can be created although there is no mutual agreement to give and receive assistance." However, it is "'necessary that there be submission by the one giving service [Commodore or Mr. Castillo] to the direction and control of the one receiving it [Ryder] as to the manner of performance.'" *Howard v. Dallas Morning News, Inc.*, *supra*, 324 Ark. at 99-100, 918 S.W.2d at 183 (*quoting* Rest.2nd of Agency § 221, cmt. c). In other words, liability of a master for his servant's acts, under the respondeat superior rule, requires that the acts have been done for, and in the service of, the master.

---

[3] The Court recognizes that the principles of law applicable to master-servant and principal-agent relationships overlap and that this opinion could have easily discussed the issues in one section rather than two. *See, e.g., Taylor v. Gill*, 326 Ark. 1040, 1043, 934 S.W.2d 919, 922 (Ark. 1996)(legal requirement that there be "submission by the one giving the service to the direction and control of the one receiving it as to the manner of performance" "applies not only to a master-servant arrangement but to principal-agent relationships as well.").

- 7 -

The facts here do not support such a conclusion.  Mr. Castillo was neither hired nor paid by Ryder.  Ryder provided him with no instruction on the load he was hauling.  Most importantly, Mr. Castillo was not delivering goods for Ryder or acting on Ryder's behalf while operating the tractor at the time of the accident.  Ryder exercised no control over and provided no direct input into where, how, or for whom Mr. Castillo was delivering product.  Rather, Ryder's only interest and involvement was in the safe and proper operation of the tractor that it owned.

After considering all of the facts relied upon and legal arguments presented by the parties (whether discussed herein or not) and applying the law, the Court concludes, based on the totality of the circumstances, that only one conclusion on the record evidence is possible – Ryder was not the employer of either Commodore or Mr. Castillo.

### C.     Carillo was not a dual agent of Ryder and Commodore

Plaintiffs also contend that Mr. Carillo was acting as Ryder's agent as well as Commodore's agent at the time of the accident giving rise to this litigation.[4]  Plaintiffs have the burden of establishing that a dual agency relationship existed.[5]  The "two essential elements of an agency relationship are (1) that an agent have the authority to act for the principal and (2) that the agent act on the principal's behalf and be subject to the principal's control."  *Taylor v. Gill*, 326 Ark. at 1043, 934 S.W.2d at 921 (Ark. 1996).

The principal's right to control his agent is a threshold requirement.  "A principal has the

---

[4] The Court accepts the underlying premise that a servant (or agent) may act for two masters (or principals).  *See* Rest. 2nd Agency § 226 ("A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other.").

[5] *See* Rest.3d Agency § 1.02, comment d; *Taylor v. Gill*, 326 Ark. 1040, 1042-43, 934 S.W.2d 919, 921 (Ark. 1996).

right to control the conduct of the agent with respect to matters entrusted to him." Rest.2d Agency § 14. "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to this control, and consent by the other so to act." Rest.2d Agency § 1. Thus, for Mr. Carillo to be considered the joint agent of Commodore and Ryder, both Commodore and Ryder must have had joint control over Mr. Carillo.

On the critical issue of right to control, a logical starting place is the Lease between Commodore and Ryder. The Court recognizes that the manner in which the parties may have characterized their relationship is not controlling on the question of agency. The Lease is important evidence, however, because it reveals the intended relationship of Commodore and Ryder and is indicative of whether Ryder manifested consent that Mr. Carillo would act on its behalf in operating the leased tractors. Further, there is no evidence that the Lease was a sham or otherwise failed to accurately depict the intended relationship of the parties, in which case it might be disregarded entirely.

The Court has reviewed the entire Lease Agreement. It reflects an arms-length transaction between separate business entities. It is not for an indefinite duration, as asserted by one of the Plaintiffs, but provides for a 42 month term as to each leased vehicle. (Agreement, Schedule A, at ¶ 2). The Agreement further provides that either party, with 60 days notice, may terminate the lease as to any Vehicle on the Vehicle's annual anniversary date. (Agreement, at ¶14).

No agency relationship is created by the fact that Ryder agreed to include maintenance with the Lease or including terms to control the providing of such maintenance. Clearly, maintenance would have to be provided by someone. Ryder agreed to provide it and no doubt

- 9 -

included a charge for the service.  The provisions relating to maintenance did not provide Ryder with the right to control Commodore in the manner in which it operated its business, only with certain rights pertaining to the manner in which the tractors would be maintained.

Significantly, there is no allegation in this case that Ryder's prior maintenance of the tractor had anything to do with contributing to Mr. Castillo's alleged negligent operation of the vehicle.  If, for example, Ryder had maintained the tractor in a negligent fashion and such had caused the accident, then Ryder might face liability for its own negligence.  Here, however, Ryder had nothing to do with Mr. Castillo's operation of the tractor on the date in question and no right to control such operation.

The alleged "veto power" Ryder retained over Commodore's drivers, on which Plaintiffs place much emphasis, must be placed in context.  The Lease provided that if a driver operated a leased vehicle in a "reckless, abusive, illegal or incompetent manner" Ryder could request that Commodore remove the driver.  The Lease further provided that Commodore's failure to remove a driver would result in Commodore being responsible to reimburse Ryder for any damage to the vehicle while driven by that driver and could also result in the cancellation of any liability insurance provided by Ryder.  (Lease, at ¶ 5B).  It does not appear that Ryder exercised this "power" very frequently.  Ryder employee Mr. Hayes testified that Ryder recommended that lessee companies remove drivers from their vehicles "very seldom less than two times" a year.  (Hayes depo., at p. 61, Exh. B to Ryder's motion).  In considering this factor, the Court recognizes that  it is the right to control that is more important than the actual control exercised.

The fact is that the nature of Ryder's right to request the removal of Commodore's drivers for cause does not equate to the power to hire and fire that may trigger an agency (or employee) relationship.  There is no evidence that Ryder assisted Commodore in deciding who to hire,

controlled any terms or conditions of their employment, or told those hired what to do. The Lease specifically provides: "All drivers must by your [Commodore's] employees or agents who are subject to your exclusive direction and control." (Lease at ¶ 5A). Again, the lease provision itself is not outcome determinative, but in this case, the lease accurately describes the relationship of the parties and the degree of control exercised by Ryder.

Nor is the fact that Ryder offered safety training to Commodore employee's helpful to the Plaintiff's case. The Lease states: "At your [lessee's] request, Ryder will provide you with its then-current standard safety program." (Lease at ¶ 2J). Commodore must have requested access to Ryder's safety program, a benefit under the Lease. This does not create a principal-agent relationship or indicate a right of control.

In viewing the facts as a whole, it must be remembered that Ryder was responsible for repairing damaged vehicles, for providing replacement vehicles, and was carrying the vehicles leased to Commodore on its own primary liability policy.[6] Accordingly, Ryder had a strong economic interest in ensuring that Commodore's drivers operated its vehicles in a safe manner. Ryder's rights under the Lease related to this legitimate business interest do not equate to a power to control Commodore's drivers as required to find a principal-agent relationship.

The Court concludes as a matter of law that there is insufficient evidence from which a reasonable finder of fact could conclude that Mr. Castillo was acting as Ryder's agent at the time of the accident.

**CONCLUSION**

The Court has considered all the arguments put forth by all the parties in their summary

---

[6] Commodore paid the cost of such coverage. Further, under the Lease, Commodore had the right to secure liability coverage from an insurer of its choosing and was not required to obtain the minimum required coverage from Ryder.

judgment papers whether or not such arguments are discussed herein.  The Court agrees with the legal arguments and interpretation of case law put forth by Ryder.  Because the Court finds and concludes that no reasonable jury could find that Ryder should be liable either under the respondeat superior doctrine or agency principles for Mr. Castillo's negligence in operating the leased tractor,

IT IS THEREFORE ORDERED that Ryder Truck Rental, Inc's Motion for Summary Judgment (Docket No. 130) be, and it is hereby, GRANTED.

IT IS SO ORDERED this   30th    day of January, 2007.

 /s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE